IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| ROBERT KOHL,<br><br>                 Plaintiff,<br><br>vs.<br><br>CHRIS BURBANK, MELODY GRAY, and SALT LAKE CITY,<br><br>                 Defendants. | ORDER AND MEMORANDUM DECISION GRANTING MOTION FOR SUMMARY JUDGMENT<br><br><br>Case No. 2:16-CV-865-TC |

Defendant Salt Lake City (SLC or the City) along with individual Defendants Chris Burbank and Melody Gray have filed a Motion for Summary Judgment asking the court to dismiss former SLC police officer Robert Kohl's claim alleging that the Defendants violated his rights under the Americans with Disabilities Act[1] (ADA).[2] Mr. Kohl contends that the City[3] failed to accommodate his learning disability, which impaired his ability to write clear incident reports. One such report gave rise to an internal affairs (IA) investigation and pre-disciplinary hearing, after which he resigned.

---

[1] 42 U.S.C. § 12101 et seq.

[2] Mr. Kohl brought another claim under 42 U.S.C. § 1983 for First Amendment Retaliation and related municipal liability, which the court dismissed on March 7, 2017. (See Mar. 7, 2017 Order & Mem. Dec. (ECF No. 22).) Only his ADA claim remains.

[3] Although Defendants Burbank and Gray are named in the ADA claim, Mr. Kohl concedes that they are entitled to summary judgment.

Defendants assert that Mr. Kohl has not established a prima facie case of failure-to-accommodate because he has not provided evidence to support his claim, and, additionally, the requested accommodation was not plausibly reasonable. For the reasons set forth below, the motion is granted.

## SUMMARY JUDGMENT STANDARD

A court must grant summary judgment when the moving party "shows that there is no genuine dispute as to any material fact" and that party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment should not be granted "if the dispute about a material fact is 'genuine,' that is, when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015). A factual dispute is genuine when "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998). The court must draw all reasonable inferences from the record in favor of the nonmovant. Id.

## FACTS

Robert Kohl was a police officer with SLC Police Department from March 11, 2001, until December 12, 2010, when he resigned from the Department. He has dysgraphia, a learning disability that makes it difficult for him to draft written reports necessary for his job, including arrest reports, such as the September 20, 2010 police report at issue here.[4]

---

[4] The City does not dispute that Mr. Kohl had difficulty writing reports because of a learning disability, nor does it dispute that Mr. Kohl was officially diagnosed in 2016 with a "[d]evelopmental disorder of written language." (Defs.' Response to Kohl's Statement of Undisputed Facts at 3, 3 n.6 (responding to "Kohl's Undisputed Fact No. 9"), ECF No. 38-1.)

At the beginning of his tenure with SLC, he participated in the Department's officer field training program. During that period, he notified his field training supervisors that he had "a difficult time writing and spelling" and asked them to review his reports and "send [them] back" for clarification or corrections if the reports sounded or looked "weird," contained misspellings, or had grammatical or other similar problems. (July 7, 2017 Dep. of Robert Kohl, attached as Ex. C to Defs.' Mot. Summ. J., at 44, 50–51, ECF No. 31-3.) At his request, they reviewed his reports and returned them if necessary so he could make corrections.

After he completed his initial training, he told each new supervisor about his disability and requested the same review.[5] He says he was accommodated until he submitted his September 2010 report (discussed in detail below).[6]

---

The City does not accept Mr. Kohl's label of "dysgraphia," but to the extent its response creates a dispute of fact, the dispute is immaterial to the issue at hand. The court assumes that Mr. Kohl was disabled as defined by the ADA.

[5]The City challenges Mr. Kohl's contention that after completing his field officer training, he alerted each new supervisor of his learning disability. (Defs.' Reply Mem. Supp. Mot. Summ. J. at 10, ECF No. 38.) Because the court finds the "plausibly reasonable" requirement dispositive of Mr. Kohl's claim (as discussed below), the court does not address the City's challenge to the sufficiency of Mr. Kohl's evidence.

[6]At some point during his career with the Department, the City also accommodated his disability by installing a dictionary and thesaurus software program onto Mr. Kohl's patrol car computer to assist him with report writing. In addition, the parties, in their papers, discuss a police union representative's offer to provide Mr. Kohl with a "'talk-to-text' dictation device." (See Defs.' Mot. Summ. J. at 22 ¶ 68, ECF No. 30.) That offer of accommodation is not relevant here because the person who offered the device did not represent the City; the offer came after the IA investigation began, i.e., after he had already written the report at issue; and Mr. Kohl "never discussed the dictation device with anyone else, let alone requested that the Department purchase such a device for him." (Id. ¶¶ 68–69.)

3

**September 20, 2010 Arrest and Use of Force Incident**

On September 20, 2010, Mr. Kohl and a fellow officer were involved in a scuffle with a young man they later arrested for possession of cocaine with intent to distribute. What occurred during that scuffle and what Mr. Kohl wrote in his arrest report prompted the events leading to Mr. Kohl's resignation. (See Sept. 20, 2010 SLC Police Dep't Gen. Occurrence Hardcopy ("Police Report"), attached as Ex. A to Defs.' Mot. Summ. J., at 6, ECF No. 31-1.)

On that September evening, Officer Jaron Harker was patrolling in downtown Salt Lake City in an area known for drug trafficking. Along one block, as he drove by, he noticed approximately twenty individuals, nearly all of whom glanced in his direction as he drove by in his police car. But one man did not, and that caught Officer Harker's attention. He watched the man slowly walk down the sidewalk and then pulled his police car behind the man.

He got out of his car and started a conversation with the man, during which Officer Harker noticed a bulge in the man's upper left cheek that prevented the man from speaking clearly. He asked the man if anyone had asked to purchase cocaine from him. When the man evaded the question, Officer Harker asked what was in his mouth, to which the man responded by "shuffl[ing] something in his left cheek and ma[king] a swallowing motion." (Id. at 8.)

To prevent the man (who Officer Harker suspected was a drug dealer) from possibly destroying evidence, Officer Harker grabbed the back of the man's neck in an effort to stop him from swallowing the object in his mouth. He also attempted to forcibly lower the man to the ground while telling him to spit out whatever was in his mouth. The man disobeyed and instead tried to escape from Officer Harker's grasp, at which point the two of them "spun in circles several times as [the man] struggled to get away from [Officer Harker]." (Id. at 9.)

At some point during Officer Harker's struggle with the man, then-Officer Kohl arrived to help. Officer Harker, in his report, described the events involving Mr. Kohl in detail:

> Officer Kohl arrived as the tussle began and quickly came to my aid as we got him to the ground. Officer Kohl held his lower half as I pushed on his mouth while telling him to spit out the drugs. Eventually the subject opened his mouth and spit out multiple crack twists (individually wrapped crack-cocaine rocks packaged for sale). It seemed he was still trying to swallow, <u>I warned him we would punch him in the stomach to assist him if he did not spit out the crack. He did not comply with our warning, Kohl delivered a strike to his stomach area. Incident to the strike two more crack rocks were blown from his mouth.</u> Still unsure if there was more in his mouth due to movement with his tung [sic] I delivered one more push on his stomach not getting anything else out. A total of 17 crack rocks were collected.

(Id. (emphasis added).) Mr. Kohl's written account of the incident matched Officer Harker's:

> The subject was spinning around and about Officer Harker's person actively trying to break free from his very firm grip. I then helped thrown [sic] this person to the ground. He landed on his back while Officer Harker was holding his face yelling at him in Spanish. Officer Harker said, "Spit it out, spit it out." <u>I placed my right knee in this person's mid-section to hold him still and pressed down quickly in an attempt to force out the things in his mouth. After a moment ten or more small white plastic wrapped squares were spat from his mouth.</u> These items look to be packaged drugs. <u>I was fearful he was trying to swallow other drugs which were in his mouth.</u> Officer Harker yelled, "Are there more? Spit them out!"
>
> <u>I then said, "If you do not spit them out I will punch you in the gut."</u>
>
> <u>The subject did not move his body or mouth. He lay still. I told Officer Harker, "Tell him in Spanish."</u>
>
> <u>Officer Harker said something in Spanish and the subject did not move his lips or body. I then punched him one time with my right fist in the center of his abdomen.</u> The person then immediately spit out two more square plastic wrapped suspected drug bindle[s] (see Crime Lab photos). He was then rolled over, I called for an arrest check, we then secure him in hand cuffs.

(Id. at 6 (emphasis added).)

After the officers arrested the man, they requested an "arrest check" from their supervisor,

5

Sergeant Stefhan Bennett. During an arrest check, a Department supervisor speaks with both the arresting officers and the detained individuals to determine, among other things, whether probable cause exists to take the suspect into custody and whether any medical attention is required.

Importantly, Sergeant Bennett did not witness the incident involving Officer Harker, Mr. Kohl, and the man, so he had no first-hand knowledge of the encounter. Rather, his understanding of the situation came from the information Officer Harker and Mr. Kohl gave to him during the arrest check and from his later review of Officer Harker's and Mr. Kohl's police reports.

During the arrest check, Officer Harker and Mr. Kohl told Sergeant Bennett they had been in a scuffle with the man and, in the course of that scuffle, the man had spit out balloons containing narcotics. The officers described the incident in generalities. But when Sergeant Bennett read Officer Harker's and Mr. Kohl's police reports later that night, he became concerned because the reports contained additional facts regarding the type, timing, and purpose of force used by Mr. Kohl, details that did not come up during the officers' on-scene discussion with Sergeant Bennett. (Dep. of Stefhan Bennett, attached as Ex. B to Defs.' Mot. Summ. J., at 24, ECF No. 31-2 ("Later that night I reviewed a report documenting what had occurred, and it was not relayed to me the same way at the scene.").)

When Sergeant Bennett was asked during his deposition what aspects of those reports caught his attention, he said:

> As I was reviewing the report, [Officer Kohl and Officer Harker] explained the scuffle they were in. And then it gets to this point where I believe the suspect is down on the ground and Officer Kohl, in his report, indicates that he tells Officer

> Harker to warn the suspect in Spanish that he was going to punch him in the stomach if he didn't spit out the balloons that he was holding in his mouth. At which point, Officer Harker gave this warning to the suspect or individual. The guy – the suspect did not comply, at which point Officer Kohl indicates he struck him in the stomach, which caused the balloons to come out of his mouth.
>
> <u>That statement was very concerning to me, based on the use of force after there was no more aggressive action by the suspect. And punching someone in the stomach is not an approved technique for getting someone to expectorate evidence from their mouth.</u>

(Id. at 26 (emphasis added).)

After reading the reports, Sergeant Bennett discussed his concerns with Lieutenant Melody Gray, who was the Watch Commander on duty at the time. They decided to bring the matter to the attention of the Department's Internal Affairs Unit ("IA").

**Internal Affairs Investigation and Notice of Pre-Disciplinary Hearing**

On September 30, 2010, IA notified Mr. Kohl that it had opened an investigation to determine whether he "used excessive force in recovering narcotic evidence." (SLC Police Dep't Notification of Investigation, attached as Ex. E to Defs.' Mot. Summ. J., ECF No. 31-5.) On October 20, 2010, as part of the investigation, IA representative Sergeant Josh Scharman interviewed Mr. Kohl.

During the interview, Mr. Kohl made statements about his use of force that were inconsistent with statements in his police report. In his police report he wrote that he "placed [his] right knee in [the suspect's] mid-section to hold him still <u>and pressed down quickly in an attempt to force out the things in his mouth</u>." (Police Report at 6 (emphasis added).) Yet Mr. Kohl told IA that because the suspect was "actively fighting," he used a knee strike to get the suspect to "stop fighting" and "submit." (Tr. of Oct. 20, 2010 IA Interview of Robert Kohl

7

("Kohl IA Interview Tr."), attached as Ex. F. to Defs.' Mot. Summ. J., at 9, ECF No. 31-6.)

Similarly, Mr. Kohl told IA that he punched the suspect in the stomach to overcome his resistance and "manipulate him to eventually get him into . . . handcuffs." (Id. at 10–12.) But in his police report, Mr. Kohl specifically stated he "was fearful [the suspect] was trying to swallow other drugs which were in his mouth," warned the suspect that if he failed to "spit them out" he would be "punch[ed] . . . in the gut," and, when the suspect did not comply, he "punched [the suspect] one time . . . in the center of his abdomen." (See Police Report at 6 (emphasis added).)

The IA interviewer asked him to explain why he did not refer in the report to the suspect's active resistance:

> JS: [Your description of the incident today] [i]s obviously significantly different then [sic] how you described in the police report.
>
> RK: Sure.
>
> JS: So we want to make sure obvious . . . this is what gets submitted to court, this is, this is what is supposed to be very accurate.
>
> RK: Uh huh. Yeah.
>
> JS: And the details that you're describing today are, they're significant. They're not like little details, you know, about shades of color or something. I mean you're talking [in your police report] about [the suspect] lay still, he doesn't move as opposed to active aggression that you're [now] describing.
>
> RK: Uh huh.
>
> JS: How do you respond, I mean that's a pretty significant difference, right?
> . . . .
>
> RK: I understand. And like again like I said that . . . that attempt to say [in the police report] that [the suspect] lays still was an attempt to describe his . . . his . . . his um . . . his facial expression. And it should have been described better than I did.

8

>           . . . .
>
> JS:     I mean you don't, from . . . from the third paragraph to the end of the report you really don't report any aggression on [the suspect's] part at all. I'm just . . . I . . . I . . . it's hard to understand how you would miss that significant of a . . . of something to put in the police report.
>          . . . . so I guess you've responded to that, I mean I guess it's . . . it should have been in there? Is that the response?
>
> RK:    Yes, it should have been in there and it should have been described, there should have been more detail of . . . of his active aggression against us.

(Kohl IA Interview Tr. at 18–19 (emphasis added).)

IA also noted (and Mr. Kohl conceded) that the language used in Mr. Kohl's police report conveyed the impression that the purpose of his stomach punch was to force the man to spit out the drugs, not to gain physical control of him. (Id. at 19–20.)

On November 1, 2010, after interviewing Mr. Kohl and Officer Harker, IA sent a "Notice of Pre-Disciplinary Hearing" to Mr. Kohl, in which it concluded he had violated two Department policies: the "Use of Force Policy" and the "Untruthfulness Policy." First, IA explained that Mr. Kohl violated the Department's "Use of Force Policy" when he "utilized inappropriate/excessive force by striking a suspect in the abdomen with a closed fist in order to force the suspect to produce narcotics which were hidden in the suspect's mouth." (Nov. 1, 2010 Notice of Pre-Disciplinary H'rg ("Pre-Disciplinary Hr'g Notice"), attached as Ex. K to Defs.' Mot. Summ. J., at 1, ECF No. 31-11.) Second, IA concluded, based on the significant discrepancies between Mr. Kohl's written police report and the statements he made during the IA interview, he had been "untruthful in the course of the internal investigation" and so had violated the Department's "Untruthfulness Policy." (See id. at 1, 3.)

The Department scheduled a pre-disciplinary hearing for November 22, 2010.

**Pre-Disciplinary Hearing**

At the pre-disciplinary hearing, Mr. Kohl admitted he lied during his IA interview. (See Tr. of Deputy Chief Richard Findlay Predisciplinary Hearing with Officer Robert Kohl at 2, attached as Ex. L to Defs.' Mot. Summ. J., ECF No. 31-12.)

> I . . . I understand that these um . . . these findings are serious. I'd like to take responsibility and ownership of what happened. . . . <u>I was not truthful</u>. I felt like, well, I sought advice from my [representative] at the time, it was an attorney. Um . . . we talked about it and I feel like I . . . I . . . I got some bad advice. But I took, I took that advice. <u>I was the person that made the decision to take, to do what I said or to say what I said.</u> . . . <u>But I did, I did say what I said in those interviews and I'm responsible for that.</u>

(<u>Id.</u> (emphasis added).) Mr. Kohl explained that he "cracked under pressure" and lied in his IA interview because he "felt like if the IA complaint was sustained for use of force then [he] was going to really get in big deep, deep trouble over this." (Id.)

On December 12, 2010, before the Department decided whether to take disciplinary action, Mr. Kohl resigned.

## ANALYSIS

Mr. Kohl's initial ADA allegations against the City gave rise to three possible theories of recovery: discrimination on the basis of his disability, hostile work environment, and failure to accommodate his disability. (See Defs.' Mot. Summ. J. at 1, ECF No. 3 (noting that Mr. Kohl's "sole remaining claim appears to implicate three separate types of purportedly unlawful conduct in violation of the [ADA]—discrimination, hostile work environment, and failure-to-accommodate").) The Defendants' Motion for Summary Judgment address all three theories.

But Mr. Kohl, in his response to the motion, narrowed the issues. First, he said, "[t]o the extent Robert has alleged a case for discrimination and hostile work environment, Robert . . .

10

does not oppose summary judgment on these claims." (Pl.'s Opp'n to Defs.' Mot. Summ. J. at 22, ECF No. 34.) Second, he did not oppose a grant of summary judgment to individual defendants Chris Burbank and Melody Gray. He recognized that neither Mr. Burbank nor Ms. Gray was his "employer" as that term is defined in the ADA, and, consequently, in their capacity as supervisors, they cannot be liable under the ADA. See Butler v. City of Prairie Village, 172 F.3d 736, 744 (10th Cir. 1999) ("[T]he ADA precludes personal capacity suits against individuals who do not otherwise qualify as employers under the statutory definition.").

Given Mr. Kohl's concessions, the court focuses solely on his failure-to-accommodate claim against the City.

**Claim of Failure-to-Accommodate**

Mr. Kohl asserts that the City discriminated against him based on his disability. "Under ADA § 102(b)(5)(A), an employer can unlawfully 'discriminate' against an employee by failing to 'mak[e] reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an . . . employee.'" EEOC v. C.R. England, Inc., 644 F.3d 1028, 1048 (10th Cir. 2011) (quoting 42 U.S.C. § 12112(b)(5)(A)). His complaint focuses "on one occasion"—i.e., when he submitted his written report about the scuffle. (Opp'n at 5.) Specifically, he contends that his supervisor Sergeant Bennett "failed to send [his] report back for clarification" and failed to give him an opportunity to supplement that report "before initiating an IA investigation based on the report." (Id. at 20–21.)

During the IA interview, he described how he would have supplemented the report had it been returned to him:. "I would have put probably . . . at least two to four paragraphs describing in greater detail what kind of resistance [the suspect gave]." (Kohl IA Interview Tr. at 31.) He

reiterated a bit later in the interview that "the part that the sergeant had said that if I . . . if I had gone back I would have worded this more and worded it differently and wrote a . . . a four . . . a two to four paragraphs describing what was happening underneath me at the time so it would be more clear of why I then struck him." (Id. at 35.)

The City responds with two arguments. First, it asserts that "the accommodation ostensibly requested by Kohl was not plausibly reasonable." (Reply at 1.) Second, it contends that Mr. Kohl did not rebut the City's evidence that he did not notify his most recent supervisors about his disability or request an accommodation from them. (Id.)

**Burdens of Proof**

When evaluating a failure-to-accommodate claim in the summary judgment context, the court analyzes the claim using a three-part burden-shifting framework. Punt v. Kelly Servs., 862 F.3d 1040, 1050 (10th Cir. 2017). First, the court determines whether the employee has initially shown that (1) he is disabled as defined by the ADA, (2) he is "otherwise qualified" to do the job, and (3) he requested a "plausibly reasonable accommodation" from his employer. Id. If the employee satisfies that burden, the court determines whether the employer has presented evidence "'either (1) conclusively rebutting one or more elements of [the employee's] prima facie case or (2) establishing an affirmative defense, such as undue hardship or one of the other affirmative defenses available to the employer.'" Id. (quoting Smith v. Midland Brake, Inc., 180 F.3d 1154, 1179 (10th Cir. 1999) (en banc)). And if the employer meets its burden, the court must grant summary judgment unless the employee presents evidence establishing a genuine issue of material fact on any affirmative defense or challenged elements of his prima facie case. Id.

**Plausibly Reasonable Accommodation**

The City does not dispute, at least for the purpose of its summary judgment motion, that Mr. Kohl satisfies the first two elements of his prima facie case (i.e., that he is disabled and was otherwise qualified for the job). But it contends that Mr. Kohl has not shown that he requested a plausibly reasonable accommodation from the City.

To establish this third element, Mr. Kohl must present evidence that the City knew not only about Mr. Kohl's disability but also about his "desire for accommodations for that disability." EEOC v. C.R. England, Inc., 644 F.3d 1028, 1049 (10th Cir. 2011) (internal citation and quotation marks omitted). "[B]efore an employer's duty to provide reasonable accommodations . . . is triggered under the ADA, the employee must make an adequate request, thereby putting the employer on notice." Id.

In addition, Mr. Kohl must show that the requested accommodation was plausibly reasonable. Punt, 862 F.3d at 1050. The court agrees with the City that Mr. Kohl's requested accommodation, as applied to Mr. Kohl's September 2010 police report, was not reasonable.

Initially, when Mr. Kohl began working for the Department, he told his field training supervisors that he had a difficult time with report writing and asked them to review his reports and "send [them] back" for clarification or corrections if the reports sounded or looked "weird," contained misspellings, or had grammatical or other similar problems. (2017 Kohl Dep. at 50–51.) The City agrees with that general characterization of Mr. Kohl's accommodation request. But, it contends, requiring Sergeant Bennett to return the September 2010 report for supplementation is unreasonable here because Sergeant Bennett had no reason to return the report for clarification.

13

According to Mr. Kohl, Sergeant Bennett should have returned the report because it provided "an unclear accounting of the altercation." (Opp'n at 13.) But the report did not exhibit apparent errors or incoherent gaps in the narrative, nor did it suggest any omission of relevant information. Mr. Kohl's report mirrored Officer Harker's report, and both reports clearly indicate that the man had been punched in the stomach to force him to spit out evidence. Even Mr. Kohl conceded in his IA interview that the language he used in the report conveyed the impression that the purpose of his stomach punch was to get the suspect to spit out the drugs, not to gain physical control of the suspect. (See Kohl IA Interview Tr. at 19.)

Sergeant Bennett had no personal knowledge of the events reported by Mr. Kohl. He was not present when the scuffle occurred. And during the arrest check, Officers Kohl and Harker spoke in generalities. Nothing would have given Sergeant Bennett reason to suspect that information about the incident had been mistakenly left out. Sergeant Bennett should not be expected to divine what, if anything, was missing.

Despite the understanding that Mr. Kohl's request for accommodation throughout his career at the Department was reasonable in the abstract (a point the City does not deny), his expectation that the September 2010 incident report at issue should have been returned to him by Sergeant Bennett for supplementation before initiating an IA investigation was not plausibly reasonable. Accordingly, the court finds that Mr. Kohl has not established a prima facie case of failure-to-accommodate under the ADA.

**ORDER**

For the foregoing reasons, Defendants' Motion for Summary Judgment (ECF No. 30) is GRANTED.

DATED this 21st day of June, 2018.

BY THE COURT:

*Tena Campbell*

TENA CAMPBELL
U.S. District Court Judge